IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| [UNDER SEAL], | § § § | ORIGINAL COMPLAINT FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT |
| Plaintiffs, | § § § | |
| | § § | **FILED UNDER SEAL** PURSUANT TO 31 U.S.C. § 3730 (b)(2) |
| v. | § § § | |
| | § § | DO NOT PUT ON PACER |
| | § § | |
| | § § | DO NOT PLACE IN PRESS BOX |
| [UNDER SEAL], | § § | |
| Defendants. | § § | |
| | § | JURY TRIAL DEMANDED |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | CIVIL NO: _____ |
| *ex rel.* Catlin Kentta, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | RELATOR CATLIN KENTTA'S |
| v. | § | ORIGINAL COMPLAINT |
| | § | |
| TRIPLE CANOPY, INC., | § | |
| CONSTELLIS, INC., | § | |
| CONSTELLIS HOLDINGS, INC., | § | FILED UNDER SEAL |
| CONSTELLIS HOLDINGS, LLC, | § | |
| | § | |
| | § | |
| Defendants. | § | JURY TRIAL DEMANDED |

**RELATOR CATLIN KENTTA'S ORIGINAL COMPLAINT**

**TABLE OF CONTENTS**

I.      Introduction to Case .........................................................................................1

II.     Jurisdiction and Venue.....................................................................................4

III.    Introduction to Relator Catlin Kentta .............................................................4

        A.      Background on Relator .........................................................................4

        B.      Original Source and Disclosures...........................................................5

IV.     Introduction to Defendants .............................................................................6

        A.      Triple Canopy, Inc. ..............................................................................6

        B.      Constellis, Inc. ....................................................................................6

        C.      Constellis Holdings, Inc........................................................................6

        D.      Constellis Holdings, LLC.. ....................................................................6

V.      Respondeat Superior and Vicarious Liability ..................................................7

VI.     Federal Acquisition Regulation ("FAR") ........................................................7

        A.      Overview...............................................................................................7

        B.      Contracting by Negotiation....................................................................8

        C.      Contractor Responsibilities....................................................................8

        D.      Submission of Claims to the Government ..............................................9

        E.      Contractor Certifications........................................................................9

        F.      Consequences of Noncompliance ........................................................10

VII.    Triple Canopy's Contract with the United States ...........................................10

        A.      Background. ........................................................................................10

        B.      August 2016 Performance Work Statement .........................................15

1.      Objective and Scope  ...........................................................................15

2.      Weapons Training  ...............................................................................15

3.      Weapons Maintenance  ........................................................................16

4.      Required Equipment  ...........................................................................16

5.      Staffing and Supervisory Requirements  .............................................17

6.      Requirements of Security Guard Personnel  ........................................17

7.      Compliance with Statutes, Regulations, and DoD Manuals  .....................18

VIII.   Triple Canopy's Nonconformance with Contract Requirements.......................................19

A.      Triple Canopy failed to properly train guards and made false representations regarding guard qualifications. ...........................................................................19

B.      Triple Canopy failed to adequately maintain weapons.........................................20

C.      Triple Canopy did not provide guards with adequate weapons, ammunition, and surveillance equipment....................................................................21

D.      Triple Canopy failed to properly supervise the Base Defense Operations Center (BDOC) at Camp Scorpion and Camp Stevenson. ....................................21

E.      Triple Canopy hired guards who did not meet the minimum age requirement in the PWS. ............................................................................22

IX.     Triple Canopy's Retaliation Against Relator....................................................22

X.      Actionable Conduct By Defendants....................................................................24

A.      False Claims Act..............................................................................................24

1.      Applicable Law........................................................................................24

2.      Defendants' Violations of the False Claims Act.......................................26

a.      Presentation of False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(A))................................................................26

b.      Making or Using False Records or Statements Materials to False or Fraudulent Claims  (31 U.S.C. § 3729(a)(1)(B)) .............27

B.    Defendants' Retaliation Against Relator .................................................................28

XI.    Causes of Action ...................................................................................................................29

A.    Count I – Presentation of False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(A)) .......................................................................................................29

B.    Count II – Making or Using False Records or Statements Material to False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(B)) .................................................30

C.    Count III – Retaliation (31 U.S.C. § 3730(h)) .......................................................32

XII.    Demand for Jury Trial ..........................................................................................................32

XIII.    Documentary Evidence .........................................................................................................32

1.      On behalf of the United States of America, and on his own behalf, Plaintiff/Relator Catlin Kentta ("Kentta" or "Relator") brings this action pursuant to the federal False Claims Act (FCA), 31 U.S.C. § 3729-3732. Relator seeks to recover all damages, penalties, and other remedies established by the FCA on behalf of the United States and on his own behalf and would respectfully show the following:

## I.      INTRODUCTION TO CASE

2.      On May 3, 2011, Defendant Triple Canopy was awarded a $499,000,000 firm fixed price contract[1] with the United States Department of the Army to provide security services at military bases overseas. On August 2, 2016, the Government began awarding Triple Canopy task orders to provide security services at the following Joint Task Force locations in Afghanistan: Camp Alpha, Camp Scorpion, Hamid Karzai International Airport, Camp Pittman, and Camp Stevenson. The purpose of the contract as applicable to Afghanistan is for Triple Canopy to "support DoD by aiding in the coordination, planning and execution of armed security operations" throughout the Afghanistan Theater of Operations (A-TO). *See* Exhibit 1 at 1.1 (August 10, 2016 Performance Work Statement for contract no. W52P1J11D0045).

3.      The August 10, 2016 Performance Work Statement (PWS) sets forth the Government's requirements of Triple Canopy in association with providing security support services. Triple Canopy is required to provide training to ensure that security guard personnel are qualified to operate their assigned weapons. The PWS also requires Triple Canopy to properly maintain weapons and ensure that guards are issued weapons, ammunition, and equipment as specified in the contract.

---

[1] The procurement ID for the contract is W52P1J11D0045.

4.     In short, Triple Canopy is required to provide the United States with security guards who are properly trained, armed, and able to respond to security threats. Triple Canopy has failed to do that.

5.     Relator Catlin Kentta worked for Triple Canopy as a security guard from February 2017 through November 2017. He worked at Camp Alpha and Camp Stevenson but spent the majority of his time at Camp Scorpion. Relator was stationed in a tower, and his primary duty was to look for suspicious activity.

6.     While he was working at Camp Scorpion, Triple Canopy required Relator and others to pull "Guardian Angel" duty, which consisted of acting as security escorts off base. Guardian Angel detail is highly dangerous and was made even more dangerous by the fact that Triple Canopy failed to provide body armor, an egress plan, or reliable radios. Triple Canopy also failed to complete required paperwork, putting guards at risk of being arrested by Afghan authorities if caught with their weapons off base. Triple Canopy did not tell Relator that he would be required to provide Guardian Angel detail off base until Relator was already in Afghanistan.

7.     After a shift of Guardian Angel detail, Relator and another guard, Joseph Love, confronted the Camp Scorpion Site Lead, Anthony DeRose, and asked him whether Triple Canopy's contract with the military required Triple Canopy's guards to provide that detail. DeRose responded that Guardian Angel detail was not in the contract.

8.     Relator later obtained the August 2016 PWS and reviewed it to see what else was or was not required of Triple Canopy's guards. Relator determined that Triple Canopy had failed to comply with multiple provisions of the PWS. For example, the PWS required Triple Canopy to provide weapons qualification training to guards and document their qualifications on scorecards. When Triple Canopy trained Relator and other guards on the M249, however, the weapons used

2

for training were in such disrepair that they were not capable of hitting a paper target twenty yards away. The Site Leader gave everyone passing scores and qualified them anyway even though no one was able to train given the malfunctioning weapons.

9. Relator also saw that the PWS required Triple Canopy to properly maintain weapons. The weapon issued to Relator, however, malfunctioned, and the weapon issued to another guard, Andrew Smith, fired more than one round when the trigger was pulled. One of Relator's co-workers, Cole Paramore, inventoried the firearms in late October or early November 2017 and found that nineteen out of forty-five of the weapons were either "deadlined" (i.e. needed a crucial piece replaced) or had serious maintenance issues.

10. Relator also noted that the PWS required Triple Canopy to provide guards with sufficient ammunition and night vision goggles. None of the guards at Camp Scorpion had night vision goggles while Relator was there, however, and Triple Canopy did not supply its guards with the amount of ammunition specified in the contract. In fact, some guards, such as Cole Paramore, had been forced to work some shifts without any ammunition at all.

11. The PWS also required Triple Canopy to have a Guard Shift Supervisor present in the Base Defense Operations Center (BDOC) twenty-four hours a day. At Camp Scorpion, however, there was no supervisor present in the BDOC from 9:00 PM to 3:45 AM (2100 – 0345).

12. Triple Canopy knew that it was not performing as required by the contract. It knew that it had failed to provide guards with proper training and that the qualification scorecards were false. It knew that guards did not have fully-functioning weapons, adequate supervision, sufficient ammunition, and other required gear. In spite of these grave shortcomings and poor performance, Triple Canopy submitted invoices for payment and has defrauded the United States out of millions.

## II.    JURISDICTION AND VENUE

13.    Jurisdiction and venue are proper in the District of Columbia pursuant to the False Claims Act (31 U.S.C. § 3732(a)), because Relator's claims seek remedies on behalf of the United States for multiple violations of 31 U.S.C. § 3729, some of which occurred in the District of Columbia. Defendants engage in business in the District of Columbia and are subject to general and specific personal jurisdiction pursuant to 31 U.S.C. § 3732(a) in that the claims for relief in this action are brought on behalf of the United States for multiple violations of 31 U.S.C. § 3729.

## III.    INTRODUCTION TO RELATOR CATLIN KENTTA

### A.    Background on Relator

14.    Relator served in the United States Army and was stationed in Afghanistan from November 2009 through November 2010. While in Afghanistan, Relator served as the company's Electronic Warfare Specialist and was responsible for programming and maintaining highly specialized and sensitive equipment. Relator also conducted vehicle and foot patrols of known danger areas to clear them of explosive hazards.

15.    After leaving the Army, Relator worked as a security guard in the private sector. He returned to Afghanistan in February 2012 and worked as a route driver for Guardian Solutions until January 2013. Relator was responsible for safely guiding client vehicles through areas known to contain IEDs and mines. After leaving Guardian Solutions, Relator spent the next several years working various jobs, including as a security guard and a firearms instructor.

16.    Relator began working for Reed, Inc. in May 2016 and returned to Afghanistan. He worked as a security guard and shift leader until leaving in November 2016.

17.     Relator began working for Triple Canopy in February 2017. He returned to Afghanistan and worked as a security guard at the following bases, where he primarily provided tower security using surveillance equipment:

| Location | Position | Timeframe |
| --- | --- | --- |
| Camp Alpha, Bagram Air Base | Tower guard | March 2017 |
| Camp Stevenson, Mazar-I-Sharif | Tower guard | March 2017 – April 2017 |
| Camp Scorpion | Tower guard, Guardian Angel detail | April 2017 – November 2017 |

18.     Relator currently resides in Tempe, Arizona and works as a firearms instructor and an inventory manager at a gun shop.

**B.      Original Source and Disclosures**

19.     There are no bars to recovery under 31 U.S.C. § 3730(e), or in the alternative, Relator is an original source as defined therein. Relator has direct and independent knowledge of the information on which his allegations are based. To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions and provided this information to the United States prior to filing a complaint by serving a voluntary pre-filing disclosure statement on December 20, 2018.

20.     As required pursuant to 31 U.S.C. § 3730(b), Relator will submit an original disclosure statement to the Attorney General of the United States and the United States Attorney for the District of Columbia, as well as all material evidence and information, contemporaneously with the service of his Original Complaint.

## IV.    INTRODUCTION TO DEFENDANTS

### A.    Triple Canopy, Inc.

Defendant Triple Canopy, Inc. ("Triple Canopy") was incorporated in Illinois on September 4, 2003. Triple Canopy's corporate office is located at 12018 Sunrise Valley Dr., #140, Reston, Virginia 20191. Triple Canopy's registered agent is Corporation Service Company, 100 Shockoe Slip, 2nd Floor, Richmond, VA 23219.

21.    Triple Canopy is a privately-held security company that contracts with Government agencies, private corporations, and non-governmental organizations worldwide. In June 2014, Triple Canopy merged with rival security contracting firm, Academi, formerly Blackwater, to form Constellis Group, with Craig Nixon, the former CEO of Academi, becoming the CEO of Constellis Group.

### B.    Constellis, Inc.

22.    Defendant Constellis, Inc., formerly Constellis Group, Inc., was incorporated in Delaware on August 2, 2011. Constellis, Inc.'s corporate office is located at 12018 Sunrise Valley Dr., #140, Reston, Virginia 20191. Constellis, Inc. is the parent corporation of Triple Canopy.

### C.    Constellis Holdings, Inc.

23.    Defendant Constellis Holdings, Inc. was incorporated in Delaware on June 2, 2014. Constellis Holdings, Inc.'s corporate office is located at 12018 Sunrise Valley Dr., #140, Reston, Virginia 20191. Constellis Holdings, Inc. is the parent corporation of Constellis, Inc.

### D.    Constellis Holdings, LLC

24.    Defendant Constellis Holdings, LLC. was formed in Delaware on September 30, 2010. Constellis Holdings, LLC's corporate office is located at 12018 Sunrise Valley Dr., #140,

6

Reston, Virginia 20191. Constellis Holdings, LLC is the parent company of Constellis Holdings, Inc.

25.    Unless otherwise specified, Triple Canopy, Inc., Constellis, Inc., Constellis Holdings, Inc., and Constellis Holdings, LLC will be collectively referred to herein as "Defendants."

## V.    RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY

26.    Any and all acts alleged herein to have been committed by Defendants were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment, or by corporate predecessors to whom successive liability applies.

27.    Defendants are related entities sharing common employees, offices, and business names such that they are jointly and severally liable. Further, the past, present and continuing relations and dealings by and between these related entities are so inextricably intertwined that for purposes of this suit, they should be considered as a single entity at law and equity.

28.    Triple Canopy does not have a separate board responsible for the company or its business dealings. Rather, it is the Constellis Holdings, LLC board that oversees and manages Triple Canopy. Contracts and task orders awarded to Triple Canopy list the company's address as 12018 Sunrise Valley Drive, Suite 140, Reston, VA 20191, which is where all of the Constellis entities are also headquartered.

## VI.    FEDERAL ACQUISITION REGULATION ("FAR")

### A.    Overview

29.    The Federal Acquisition Regulation ("FAR") is a system of regulations jointly issued by the Department of Defense, the U.S. General Services Administration, and the National

Aeronautics and Space Administration for use in acquiring goods and services in a uniform manner for government contracts.  The FAR is codified in Title 48 of the United States Code of Federal Regulations.

30.     The Defense Federal Acquisition Regulation Supplement ("DFARS") is a system of regulations administered by the Department of Defense for the purpose of implementing and supplementing the FAR. DFARS establishes delegations of FAR authorities, deviations from FAR requirements, DoD-wide policies, and should be read in conjunction with the primary set of rules in FAR.

**B.     Contracting by Negotiation**

31.     Part 15 of the FAR describes the policies and procedures for awarding and entering into a negotiated contract.  A contract awarded using a process other than a sealed bid process is a negotiated contract. 48 C.F.R. § 15.000. The objective of selecting a source for an item under a negotiated contract is to select the proposal that represents the best value.  48 C.F.R. § 15.302. "Best value" means the expected outcome of an acquisition that, in the Government's estimation, provides the greatest overall benefit in response to the requirement.  48 C.F.R. § 2.101(b)(2).

32.     An award is based on many evaluation factors.  Although the evaluation factors are largely discretionary dependent upon the particular contract at issue, certain factors must be taken into consideration, including the price or cost to the Government, the quality of the service provided, and the past performance.  48 C.F.R. § 15.304(b).

**C.     Contractor Responsibilities**

33.     Pursuant to 48 C.F.R. § 46.105(a), the "contractor is responsible for carrying out its obligations under the contract by: (1) controlling the quality of supplies or services; and, (2) Tendering to the Government for acceptance only those supplies or services that conform to

8

contract requirements." The control of quality by the contractor may relate to, but is not limited to "procedures and processes for services to ensure that services meet contract performance requirements." 48 C.F.R. § 46.105(c).

**D.      Submission of Claims to the Government**

34.      Pursuant to 48 C.F.R. § 32.905(a), the basis for payment is on receipt of a proper invoice and satisfactory contract performance.  With the limited exception of interim payments on cost-reimbursement contracts for services, all invoice payments must be supported by a receiving report or any other Government documentation authorizing payment. 48 C.F.R. § 32.905(c). Documentation must include, at a minimum, description of the supplies delivered, or services performed, and quantities of supplies received and accepted, or services performed.  48 C.F.R. § 32.905(c)(2) and (3).

35.      Pursuant to 48 C.F.R. § 32.007(a)(1), contract financing payments are due the thirtieth day after the designated billing office receives "a proper contract financing request." A proper contract financing request "must comply with the terms and conditions specified by the contract," and the contractor must correct any defects in requests submitted. 48 C.F.R. § 32.007(c).

**E.      Contractor Certifications**

36.      The general FAR invoice requires the contractor to certify that the voucher is proper.  Specifically, Standard Form 1034 states, before the contractor's signature line: "I certify that this voucher is correct and proper for payment."  48 C.F.R. § 53.301-1034.  By certifying that the voucher is proper for payment, the contractor certifies that the voucher is a good faith request for payment in accord with the contract.

37.      Contractors are also required to make the following certifications when submitting any claim exceeding $100,000: "I certify that the claim is made in good faith; that the supporting

9

data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the contractor." *See* 48 C.F.R. § 33.207(c).

### F.     Consequences of Noncompliance

38.     A contractor may be debarred if found liable for commission of fraud in connection with obtaining, attempting to obtain, or performing a public contract. *See* 48 C.F.R. § 9.406-2(a)(1). Furthermore, knowing failure by a principal to timely disclose to the Government credible evidence of a violation of the False Claims Act, or significant overpayments on the contract, constitutes grounds for disbarment. *See* 48 C.F.R. § 9.406-2(b)(1)(vi)(B) and (C). Moreover, the Government may reduce or suspend contract payments upon a finding of fraud. *See* 48 C.F.R. § 32.006-1(b).

### VII.     TRIPLE CANOPY'S CONTRACT WITH THE UNITED STATES

### A.     Background

39.     On May 3, 2011, Triple Canopy signed a firm fixed price contract[2] valued at $499,000,000 with the United States Department of the Army to provide security services at military bases overseas. Multiple task orders have been awarded as part of this contract. Task Orders OK01 and OK02 are associated with the work Triple Canopy has performed at military bases in Iraq.

40.     On August 2, 2016, the Government began awarding Triple Canopy task orders to provide security services to military bases in Afghanistan. The following task orders for contract ID no. W52P1J11D0045 have been awarded to Triple Canopy for work in Afghanistan:

---

[2] The procurement ID for the contract is W52P1J11D0045.

| Task Order / Modification No. | Date Signed | Reason for Modification | Total Action Obligation | Description of Requirement |
|---|---|---|---|---|
| OK05 | 8.2.2016 | N/A | $4,831,333.00 | IGF::OT::IGF |
| OK05-1 | 11.30.2016 | Other administrative action | $4,831,333.00 | IGF::OT::IGF |
| | | | | |
| OK06 | 9.1.2016 | N/A | $10,140,520.94 | IGF::OT::IGF |
| OK06-1 | 9.26.2016 | Supplemental agreement for work within scope | $24,623,816.77 | IGF::OT::IGF |
| OK06-2 | 2.17.2017 | Other administrative action | $24,623,816.77 | IGF::OT::IGF |
| OK06-3 | 4.17.2017 | Other administrative action | $24,623,816.77 | IGF::OT::IGF |
| OK06-4 | 9.12.2017 | Exercise an option | $24,623,816.77 | IGF::OT::IGF |
| OK06-5 | 12.13.2017 | Supplemental agreement for work within scope | $24,623,816.77 | Armed security guards for entry control points and towers in support of Joint Task Force locations in Afghanistan. |
| OK06-6 | 8.16.2018 | Other administrative action | $24,623,816.77 | Provide armed security guards and interior roving patrol services in support of Joint Task Force locations in Afghanistan (Camp Alpha, Camp Scorpion, Hamid Karzai International Airport, and Camp Stevenson). |
| | | | | |
| OK07 | 9.13.2016 | N/A | $1,608,966.51 | IGF::OT::IGF |
| OK07-1 | 4.17.2017 | Supplemental agreement for work within scope | $4,912,724.74 | IGF::OT::IGF |

11

| Task Order / Modification No. | Date Signed | Reason for Modification | Total Action Obligation | Description of Requirement |
|---|---|---|---|---|
| OK07-2 | 8.30.2017 | Exercise an option | $4,912,724.74 | IGF::OT::IGF |
| OK07-3 | 5.14.2018 | Supplemental agreement for work within scope | $4,912,724.74 | Armed security guards for entry control points and guard towers. |
| | | | | |
| OK08 | 9.17.2016 | N/A | $2,235,369.89 | IGF::OT::IGF |
| OK08-1 | 4.17.2017 | Supplemental agreement for work within scope | $8,220,956.59 | IGF::OT::IGF |
| OK08-2 | 8.3.2017 | Supplemental agreement for work within scope | $8,220,956.59 | IGF::OT::IGF |
| OK08-3 | 8.30.2017 | Exercise an option | $8,220,956.59 | IGF::OT::IGF |
| OK08-4 | 12.11.2017 | Supplemental agreement for work within scope | $8,220,956.59 | To provide armed security guards for entry control points and towers. |
| OK08-5 | 5.14.2018 | Supplemental agreement for work within scope | $8,220,956.59 | Armed security guards for entry control points and guard towers at Shorab in Afghanistan. |
| | | | | |
| OK09 | 12.22.2016 | N/A | $1,218,756.68 | IGF::OT::IGF |
| OK09-1 | 1.24.2017 | Other administrative action | $2,928,814.17 | IGF::OT::IGF |
| OK09-2 | 1.12.2018 | Exercise an option | $2,928,814.17 | Option Period |
| OK09-3 | 2.14.2018 | Supplemental agreement for work within scope | $2,928,814.17 | Uplift- 45 personnel |
| OK09-4 | 2.15.2018 | Other administrative action | $2,928,814.17 | Afghanistan Security Services |
| | | | | |
| OK10 | 2.1.2017 | N/A | $1,488,499.54 | IGF::OT::IGF |

| Task Order / Modification No. | Date Signed | Reason for Modification | Total Action Obligation | Description of Requirement |
|---|---|---|---|---|
| OK10-1 | 2.14.2017 | Other administrative action | $5,313,037.45 | IGF::OT::IGF |
| OK10-2 | 1.30.2018 | Exercise an option | $5,313,037.45 | Option Period 1 |
| OK10-3 | 2.1.2018 | Other administrative action | $5,313,037.45 | Administrative Change |
| OK10-4 | 5.2.2018 | Supplemental agreement for work within scope | $5,313,037.45 | Security services in support of Afghanistan |
|  |  |  |  |  |
| OK11 | 3.1.2018 | N/A | $2,145,027.83 | Provide Armed Security Guards and Internal Roving Patrols at Joint Task Force locations in Afghanistan. |
| OK11-1 | 5.21.2018 | Other administrative action | $30,065,985.89 | Provide armed security and internal roving patrol services in support of Joint Task Force locations in Afghanistan (Camp Alpha, Camp Scorpion, Hamid Karzai International Airport, Camp Valdez, and Camp Stevenson) |
| OK11-2 | 6.13.2018 | Exercise an option | $30,065,985.89 | Provide armed security guards and internal roving patrols in support of Joint Task Force locations in Afghanistan (Camp Alpha, Camp Scorpion, Hamid Karzai International Airport, Camp |

13

| Task Order / Modification No. | Date Signed | Reason for Modification | Total Action Obligation | Description of Requirement |
|---|---|---|---|---|
| | | | | Valdez, and Camp Scorpion). |
| OK11-3 | 8.1.2018 | Change order | $30,065,985.89 | Provide armed security guards and internal roving patrol services in support of Joint Task Force locations in Afghanistan (Camp Alpha, Camp Scorpion, Hamid Karzai International Airport (HKIA), Camp FSB, and Camp Stevenson) |
| | | | | |
| OK12 | 5.14.2018 | N/A | $1,396,351.65 | Provide Armed Security Guards and Internal Roving Patrols at El Dahlke in Afghanistan. |
| OK12-1 | 5.29.2018 | Exercise an option | $4,095,782.77 | Provide Armed Security Guards and Internal Roving Patrols at El Dahlke in Afghanistan. |

*See* Exhibit 2 (Summaries of Task Order OK05 and modifications); *see also* Exhibit 3 (Summaries of Task Order OK06 and modifications); *see also* Exhibit 4 (Summaries of Task Order OK07 and modifications); *see also* Exhibit 5 (Summaries of Task Order OK08 and modifications); *see also* Exhibit 6 (Summaries of Task Order OK09 and modifications); *see also* Exhibit 7 (Summaries of Task Order OK10 and modifications); *see also* Exhibit 8 (Summaries of Task Order OK11 and modifications); *see also* Exhibit 9 (Summaries of Task Order OK12 and modifications).

14

**B.        August 2016 Performance Work Statement**

### 1.        Objective and Scope

41.        The August 10, 2016 Performance Work Statement (PWS) sets forth the Government's requirements of Triple Canopy in association with providing security support services at the following Joint Task Force locations in Afghanistan: Camp Alpha, Camp Scorpion, Hamid Karzai International Airport, Camp Pittman, and Camp Stevenson. *See* Exhibit 1 at 1.2 (August 10, 2016 Joint Task Force Performance Work Statement). The purpose of the contract is for Triple Canopy to "support DoD by aiding in the coordination, planning and execution of armed security operations" throughout the Afghanistan Theater of Operations (A-TO). *Id.* at 1.1.

42.        The stated scope of the PWS is for Triple Canopy to provide "all labor, equipment, weapons, and ammunition" as defined within the PWS, as well as "continuous, responsive, uninterrupted, and highly skilled security support." *Id.* at 1.2.1 The PWS further specifies that Triple Canopy will "configure its resources such that there are no gaps in service." *Id.*

### 2.        Weapons Training

43.        The PWS requires Triple Canopy to provide documented weapons training to its guards both before and after deployment. *Id.* at 2.3.9–2.3.9.2. Regarding crew-served weapons, "[i]nitial weapons qualification (all weapons certification minus crew-served weapons as is required for Standard Arming Authorization) must be completed prior to deployment to JTF with correctly completed scorecards per Standard Arming Authorization requirements." *Id.* at 2.3.9.2.

44.        The PWS further states, "Armed contractors will be required to be proficient operators of their assigned weapon(s) prior to arrival in country. Weapons training will be documented on weapons qualification forms IAW Attachment 3 to USFOR-A 16-143. Non-U.S.

15

and Non-Standard weapons shall be requested IAW Attachment 2 to USAFOR-A 16-143. Unsatisfactory employee qualification results shall be reported to the COR." *Id.* at 2.3.9.

### 3.    Weapons Maintenance

45.    The PWS contains the following regarding weapons maintenance:

> All weapons shall be checked and cleaned periodically. All armed personnel shall ensure their weapons are in proper working order at all times. All armed personnel shall conduct daily function checks on all assigned weapons prior to assuming duties. If an employee knows, or should know that his/her weapon is not in the proper working condition, the employee shall immediately report to their Security Guard Supervisor or the contractor's appropriate chain of command for repair and/or approved replacement.

*Id.* at 2.3.9.10.

46.    The PWS requires Triple Canopy to proactively repair or replace outdated or unserviceable weapons and ammunition, noting that the knowing use of non-functioning or unserviceable equipment may present a "grave security risk" for personnel stationed within the area. *Id.* at 2.3.13.2.

### 4.    Required Equipment

47.    The PWS requires Triple Canopy to provide personnel with the following weapons and equipment:

- One U.S. M-16 rifle or M-4 carbine
- One U.S. M9 pistol
- Magazines
- Protective body armor
- Kevlar helmet
- Uniforms
- Passive infrared (IR) night vision device
- IR laser aiming/illuminating device

16

- Any other operational equipment to perform facility protective services while on duty

*Id.* at 2.3.13.

48.     All M9 pistols, M-16 rifles, and M-4 carbines provided must be "serviceable and fully functioning items." *Id.* at 2.3.9. Furthermore, while on duty, "all armed personnel shall have a basic load (210 rounds of 5.56mm and 45 rounds of 9mm) of ammunition on their person for their assigned M-16/M4 series rifle (5.56mm), pistol (9mm) and the required basic load for crew served weapons systems." *Id.* at 2.3.12.1.

### 5.     Staffing and Supervisory Requirements

49.     The PWS requires Triple Canopy "to maintain an adequate workforce to ensure uninterrupted performance of all tasks defined within this PWS." *Id.* at 7.0. It is Triple Canopy's responsibility to "ensure the required number of personnel to execute full performance of the contract is on hand at all times." *Id.* at 12.1.4.1.15; *see also* § 12.1.8.3 (requiring Triple Canopy to maintain a pool of qualified personnel to mitigate manning shortfalls).

50.     The PWS repeatedly emphasizes that Triple Canopy must have adequate personnel available twenty-four hours a day, every day. *Id.* at 12.1.8.1; *see also* §§ 12.1.8.2, 12.1.8.4.3.3, and 12.1.10.

51.     Guard shift leaders supervise security guards and must "work on the BDOC [Base Defense Operations Center] or equivalent or force protection command watch floor 24 hours per day, seven days per week, and serve as the operational linkage between the Government and the contractor." *Id.* at 12.1.4.1.9.

### 6.     Requirements of Security Guard Personnel

52.     The PWS requires Triple Canopy to "provide a work force possessing the skills, knowledge, training, equipment and certifications required to satisfactorily perform the services

17

required" under the contract. *Id.* at 6.1. Triple Canopy's security guards must be at least twenty-three years of age and must be qualified on the primary weapon used. *Id.* at 12.1.4.1.6. The contract requires Triple Canopy to vet all employees and "provide official written certification of candidate(s) suitability for Armed Security Guard employment" to the Government's contracting officer. *Id.* at 12.1.8.4.2.

53. Security guards are prohibited from, and are subject to disciplinary action for, owning personal cell phones, loitering at the duty station after scheduled hours, possessing their assigned weapons outside of designated duty areas, and engaging in physical altercations of any kind. *Id.* at 12.1.8.4.3.2.

### 7. Compliance with Statutes, Regulations, and DoD Manuals

54. The PWS requires Triple Canopy to "ensure that all contractor personnel and its subcontractor personnel at all tiers comply, at all times, with (i) all applicable DoD regulations, directives, instructions, policies, procedures, and other orders issued by DoD Commander or his/her representative." *Id.* at 2.1. Triple Canopy is also required to comply with multiple specific policies and manuals, such as Army Field Manual 3-22.9, Rifle Marksmanship, which sets forth requirements related to weapons training. *Id.* at 2.1.

55. Triple Canopy also must develop and maintain an effective quality control program consistent with the ANSI/ASIS PSC.1-2012 American National Standard, Management System for Quality of Private Security Company Operations, which sets forth guidance on selecting, screening, and vetting personnel and ensuring that personnel possess the appropriate competence. *Id.* at 13.1. The PWS requires Triple Canopy to "develop and implement procedures to identify, prevent and ensure non-recurrence of defective services" and further states that the quality control

18

program is the "means by which [Triple Canopy] assure[s] themselves that work complies with the requirements of the contract." *Id.*

### VIII.    TRIPLE CANOPY'S NONCONFORMANCE WITH CONTRACT REQUIREMENTS

56.    The United States contracted with Triple Canopy to provide security services to military bases in Afghanistan. The contract requires Triple Canopy to provide personnel who *i*) are properly trained, *ii*) are equipped with the weapons and gear specified in the PWS, and *iii*) otherwise meet the contractual requirements. Triple Canopy is also required to properly supervise its personnel and operations twenty-four hours a day, seven days a week.

57.    Instead of giving the United States the properly armed and trained security guards the military bargained for, Triple Canopy issued its personnel malfunctioning weapons and has failed to do the following: *i*) properly train and certify personnel on assigned weapons, *ii*) maintain weapons, *iii*) provide sufficient numbers of weapons, ammunition, and gear as required by the contract, *iv*) ensure adequate supervision at the Base Defense Operations Center, and *v*) ensure all guards meet the minimum age requirement.

**A.    Triple Canopy failed to properly train guards and made false representations regarding guard qualifications.**

58.    Triple Canopy is required to train guards on operating their assigned weapons, including the M249 automatic weapon. Training must be conducted and documented on weapons qualifications forms both before and after deployment. *See* Exhibit 1 at 2.3.9–2.3.9.2.

59.    Relator was trained on the M249 at Camp Scorpion by Site Leader Anthony DeRose. The M249s used for training purposes were in such disrepair that they could not even hit a paper target twenty yards away. DeRose dismissed the importance of the training, saying that it was only familiarization fire. DeRose gave all trainees a passing score on the score cards that he turned in, which falsely represented that the guards had received proper training. None of the

19

guards who Relator worked with at Camp Scorpion were qualified to operate the M249, because they had not been trained with one that worked properly. The Project Lead, Joshua Munch, also knew that the guards received inadequate training, because he had previously been the Site Lead at Camp Scorpion.

60.     Management falsified weapons qualification scores throughout Relator's employment with Triple Canopy, including scores associated with training to use M320 40 mm grenade launchers with HEDP rounds. The towers at Camp Scorpion were equipped with grenade launchers, but no one had been properly trained and qualified to operate them.

**B.     Triple Canopy failed to adequately maintain weapons.**

61.     Triple Canopy is required to maintain weapons used by its personnel, but it has failed to do so. Relator was issued a malfunctioning weapon when he worked at Camp Scorpion. *See* Exhibit 10 (Video showing Relator attempting to operate a weapon that would not fire). Relator's co-worker, Andrew Smith, also was issued a malfunctioning weapon, but Smith's randomly fired more than one round when the trigger was pulled.

62.     Many of the weapons at Camp Scorpion were in disrepair while Relator was stationed there. One of Relator's co-workers, shift lead Cole Paramore, conducted an inventory in late October or early November 2017 and found that nineteen out of forty-five weapons were either "deadlined" (i.e. needed a crucial piece replaced) or had serious maintenance issues, such as more than one round coming out when the weapon was fired. Some weapons did not fire at all.

63.     As stated in the PWS, the "knowing use of non-functioning or unserviceable equipment may present a 'grave security risk' for personnel stationed within the area." Exhibit 1 at 2.3.13.2. Triple Canopy was well aware that many weapons at Camp Scorpion did not function properly, but neither did it report the deficiencies nor adequately maintain the firearms.

**C.     Triple Canopy did not provide guards with adequate weapons, ammunition, and surveillance equipment.**

64.     Triple Canopy failed to maintain enough ammunition on hand to sufficiently equip guards in accordance with the contract. For example, section 2.3.12.1 of the PWS requires that "all armed personnel shall have a basic load (210 rounds of 5.56mm and 45 rounds of 9mm) of ammunition on their person for their assigned M-16/M4 series rifle (5.56mm) pistol (9mm) and the required basic load for crew served weapons systems," but some guards at Camp Scorpion were only given one magazine of ammunition.

65.     Guards returning to Camp Scorpion after taking leave were forced to work for periods of time without a weapon or ammunition at all. For example, while guard Cole Paramore was out on leave, Triple Canopy issued Paramore's ammunition to another guard, leaving Paramore with no ammunition when he returned.

66.     Another guard, Joseph Love, returned from leave in late October 2017 and discovered that Triple Canopy had issued his weapon to someone else, leaving him without a weapon when he returned. Triple Canopy stationed him at an internal tower due to the fact that he did not have a weapon and forced him to work multiple shifts while unarmed. *See* Exhibit 11 (Camp Scorpion shift schedule noting, "Love must go to 3rd shift internal tower only.").

67.     Furthermore, none of the guards were issued passive infra-red (IR) night vision devices or IR laser aiming/illuminating devices while Relator was stationed at Camp Scorpion, and only one or two guards at Camp Alpha had these devices.

**D.     Triple Canopy failed to properly supervise the Base Defense Operations Center (BDOC) at Camp Scorpion and Camp Stevenson.**

68.     The PWS requires Triple Canopy to have a guard shift supervisor inside the Base Defense Operations Center (BDOC) twenty-four hours a day. Exhibit 1 at 12.1.4.1.9. The BDOC

21

at Camp Scorpion, however, had no Triple Canopy guard shift supervisors from 9:00 PM to 3:45 AM (2100 – 0345) throughout Relator's time there, which was witnessed by Army staff sergeants Johnson and Gonzalez with the 10th Mountain Division.

69.    Furthermore, Relator and a co-worker witnessed the Site Lead at Camp Stevenson, Mary Webb, leaving the BDOC unattended and the SIPR computer[3] unlocked multiple times, which put classified information at risk.

**E.    Triple Canopy hired guards who did not meet the minimum age requirement specified in the PWS.**

70.    The PWS specifies the qualifications that guards must meet, including a minimum age requirement, which is twenty-three. Exhibit 1 at 12.1.4.1.6. Relator knew of at least one guard who was only twenty-one and found that multiple guards were shy of the minimum age requirement.

## IX.    TRIPLE CANOPY'S RETALIATION AGAINST RELATOR

71.    When Relator arrived at the BDOC at Camp Stevenson, he introduced himself to another guard, Jeramiah Thompson, who told Relator, "If you come in my room unannounced, I'll kill you." When Relator gave him a puzzled look, Thompson said, "I'm just telling you, if you come in my room without knocking, you'll get a chest full of 9 mil." Thompson also made racist remarks and said he wanted to "exterminate the locals like the dogs they are."

72.    Thompson threatened to shoot or stab other employees if they "did anything stupid." Despite being made aware of Thompson's threats and behavior, Site Leader Mary Webb refused to discipline Thompson or hold him accountable in any way. In fact, she said he was the

---

[3] The Secret Internet Protocol Router Network (SIPRNet) is a system of interconnected computer networks used by the U.S. Department of Defense and the U.S. Department of State to transmit classified information.

22

only one she could trust, and they frequently discussed how they could "thin the herd" by forcing people to resign.

73.    On March 31, 2017, Thompson, who was off duty, was sitting in the BDOC in front of the SIPR computer when his cell phone went off. Guards are prohibited from loitering at duty stations while off duty[4] and possessing personal cell phones[5].

74.    Relator complained about these violations to the Shift Manager, Izzy, who said he would address it with Mary Webb. After receiving Relator's report, Webb confronted Relator and told him to "drop it" and said that Thompson did not violate any policies because he was off shift. Webb then wrote on a board that all issues needed to be reported to her and verbally warned that anyone who went to corporate would be fired.

75.    Relator transferred to Camp Scorpion in April 2017 and was made to pull Guardian Angel duty, which consisted of acting as personal security detail off base. *See* Exhibit 12 (Triple Canopy's description of Guardian Angel detail). Guardian Angel detail is highly dangerous and was made even more dangerous by the fact that Triple Canopy failed to provide body armor, an egress plan, or reliable radios. Triple Canopy also failed to complete required paperwork, putting Relator at risk of being arrested by Afghan authorities if caught with weapons off base.

76.    After a shift of Guardian Angel detail, Relator and another guard, Joseph Love, confronted the Camp Scorpion Site Lead, Anthony DeRose, and asked him whether Triple Canopy's contract with the military required Triple Canopy's guards to provide that detail. DeRose responded that Guardian Angel detail was not in the contract.

---

[4] *See* Exhibit 1 at 12.1.8.4.3.2.
[5] *See* Exhibit 1 at 10.1.3 and 12.1.8.4.3.2.

23

77. In October 2017, Relator obtained the August 2016 PWS and reviewed it to see what else was or was not required of Triple Canopy's guards. On October 30, 2017, less than twenty-four hours after learning that Relator obtained a copy of the PWS, Anthony DeRose issued a "Performance Work Statement Policy." *See* Exhibit 13 (Triple Canopy Performance Work Statement Policy). The policy stated that anyone caught with the PWS needed to turn it in immediately for destruction and that failure to do so would result in termination. *Id.* The policy and the threat of termination was clearly directed at Relator and was in response to Relator's prior reports of violations and efforts to stop future violations.

78. Relator witnessed multiple security breaches at Camp Scorpion. He reported these breaches to the camp commandant and contracting officer at Camp Stevenson. Shortly after making his report, the program manager at Camp Stevenson called Relator, pulled him from duty, and said to Relator, "Shut your f***ing mouth and do your f***ing job."

79. Relator was threatened, harassed, and discriminated against as a result of his complaints of Triple Canopy's security breaches and conduct in violation of the PWS.

## X. ACTIONABLE CONDUCT BY DEFENDANTS

### A. False Claims Act

#### 1. Applicable Law

80. This is an action to recover damages and civil penalties on behalf of the United States and Relator Kentta arising from the false and/or fraudulent statements, claims, and acts by Defendants made in violation of the False Claims Act, 31 U.S.C. §§ 3729–3732.

81. The FCA provides that any person who

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; or

(B)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim

is liable to the Government for a civil penalty of not less than $11,181 and not more than $22,363 for each such claim, plus three times the amount of damages sustained by the Government because of the false or fraudulent claim. *See* 31 U.S.C. § 3729(a)(1).

82.     The FCA defines "claim" as:

(A)     mean[ing] any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--

(i)     is presented to an officer, employee, or agent of the United States; or

(ii)    is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

(I)     provides or has provided any portion of the money or property requested or demanded; or

(II)    will reimburse such contractor, grantee, or other recipient for any portion of the money  or  property which is requested or demanded. . . .

31 U.S.C. §3729(b)(2).

83.     The FCA allows any persons having knowledge of a false or fraudulent claim against the Government to bring an action in federal district court for himself and for the United States and to share in any recovery as authorized by 31 U.S.C. § 3730. The FCA also protects a whistleblower who has suffered retaliation because of his efforts to stop one or more violations of the False Claims Act. *See* 31 U.S.C. § 3730(h).

84.     Based on these provisions, Relator Kentta, on behalf of the United States and on his own behalf, seeks through this action to recover damages and civil penalties arising from Defendants' violations of the False Claims Act.

**2.    Defendants' Violations of the False Claims Act**

**a.       Presentation of False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(A))**

85.    From 2016 to the present, Defendants have knowingly presented false or fraudulent claims associated with task orders OK05, OK06, OK07, OK08, OK09, OK10, OK11, and OK12 for contract ID no. W52P1J11D0045.

86.    Specifically, Triple Canopy's contract with the United States required Triple Canopy to provide guards who were properly trained and equipped. When Triple Canopy submitted invoices to the United States seeking payment for work performed under the contract, it certified, both expressly and impliedly, that it performed the work as required. In reality, however, Triple Canopy failed to properly train personnel on operating assigned weapons, issued personnel malfunctioning weapons, failed to provide guards with adequate equipment, failed to ensure personnel met all requirements in the contract, and failed to properly supervise personnel.

87.    Pursuant to 48 C.F.R. § 32.905(a), the basis for payment is on receipt of a proper invoice and satisfactory contract performance. Triple Canopy caused the United States to make payments for security guard services that it would not have made had it known the guards were not properly trained, equipped, and supervised. The United States only pays for goods and services that are provided in conformity with contract specifications.

88.    Defendants' violations of the contractual requirements were material, because they went to the very essence of the bargain for which the United States contracted. The United States believed it was paying for armed security guards who were well-equipped to assist with protecting military bases. Triple Canopy instead invoiced the United States for guards who were not properly trained and who had been assigned malfunctioning weapons that would have been useless during a threat. Had the United States known of Defendants' unsatisfactory performance, which resulted

in the submission of ineligible claims for reimbursement, the United States would not have paid the claims.

89.     By virtue of Defendants' actions, the United States has suffered damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

**b.    Making or Using False Records or Statements Material to False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(B))**

90.     From 2016 to the present, Defendants knowingly made or used false records or statements material to false or fraudulent claims paid or approved by the United States. These false statements or records include training scorecards and weapons qualification records, as well as certifications related to the maintenance of weapons and qualifications of personnel. Triple Canopy also falsely certified that the invoices it submitted to the United States were correct and proper for payment.

91.     Defendants' false statements and false records were material to the claims paid by the United States, because they went to the very essence of the bargain for which the United States contracted. The United States believed it was paying for armed security guards who were well-equipped to assist with protecting military bases. Triple Canopy instead invoiced the United States for guards who were not properly trained and who had been assigned malfunctioning weapons that would have been useless during a threat. Had the United States known of Defendants' unsatisfactory performance, which included falsifying the weapons qualifications scores for guards, the United States would not have paid the claims.

92.     Defendants' false statements and records had the potential to influence the government's payment decision and were material to the government's decision to pay the claims. Triple Canopy caused the United States to make payments for security guard services that it would not have made had it known that Triple Canopy was not properly training and equipping guards in

27

accordance with the contract. The United States only pays for goods and services that are provided in conformity with contractual requirements.

93.    Defendants' false records and statements were foreseeable factors in the United States' loss and a consequence of the scheme.  By virtue of Defendants' actions, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

**B.    Defendants' Retaliation Against Relator**

94.    Section 3730(h) of Title 31 of the U.S. Code defines whistleblower protection under the FCA as follows:

> (1)    Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, or agent on behalf of the employee, contractor, or agent or associated others in furtherance of efforts to stop 1 or more violations of this subchapter. . . .

> (2)    Relief … shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

31 U.S.C. § 3730(h).

95.    As discussed *supra*, Triple Canopy retaliated against Relator as a result of his reports related to security breaches and Triple Canopy's failure to perform work in accordance with its contract with the United States.

96.    Mr. Kentta has suffered economic loss as a result of Defendants' retaliatory acts and is entitled to relief pursuant to 31 U.S.C. § 3730(h).

## XI.    CAUSES OF ACTION

### A.    Count I – Presentation of False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(A))

97.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

98.    From 2016 to the present, Defendants have knowingly presented false or fraudulent claims associated with task orders OK05, OK06, OK07, OK08, OK09, OK10, OK11, and OK12 for contract ID no. W52P1J11D0045.

99.    Specifically, Triple Canopy's contract with the United States required Triple Canopy to provide guards who were properly trained and equipped. When Triple Canopy submitted invoices to the United States seeking payment for work performed under the contract, it certified, both expressly and impliedly, that it performed the work as required. In reality, however, Triple Canopy failed to properly train personnel on operating assigned weapons, issued personnel malfunctioning weapons, failed to provide guards with adequate equipment, failed to ensure personnel met all requirements in the contract, and failed to properly supervise personnel.

100.    Pursuant to 48 C.F.R. § 32.905(a), the basis for payment is on receipt of a proper invoice and satisfactory contract performance. Triple Canopy caused the United States to make payments for security guard services that it would not have made had it known the guards were not properly trained, equipped, and supervised. The United States only pays for goods and services that are provided in conformity with contract specifications.

101.    Defendants' violations of the contractual requirements were material, because they went to the very essence of the bargain for which the United States contracted. The United States believed it was paying for armed security guards who were well-equipped to assist with protecting military bases. Triple Canopy instead invoiced the United States for guards who were not properly

29

trained and who had been assigned malfunctioning weapons that would have been useless during a threat. Had the United States known of Defendants' unsatisfactory performance, which resulted in the submission of ineligible claims for reimbursement, the United States would not have paid the claims.

102.    The United States paid the false or fraudulent claims.

103.    By virtue of Defendants' actions, the United States has suffered damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

**B.    Count II – Making or Using False Records or Statements Material to False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(B))**

104.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

105.    From 2016 to the present, Defendants knowingly made or used false records or statements material to false or fraudulent claims paid or approved by the United States. These false statements or records include training scorecards and weapons qualification records, as well as certifications related to the maintenance of weapons and qualifications of personnel. Triple Canopy also falsely certified that the invoices it submitted to the United States were correct and proper for payment.

106.    Defendants' false statements and false records were material to the claims paid by the United States, because they went to the very essence of the bargain for which the United States contracted. The United States believed it was paying for armed security guards who were well-equipped to assist with protecting military bases. Triple Canopy instead invoiced the United States for guards who were not properly trained and who had been assigned malfunctioning weapons that would have been useless during a threat. Had the United States known of Defendants'

30

unsatisfactory performance, which included falsifying the weapons qualifications scores for guards, the United States would not have paid the claims.

107. Defendants' false statements and records had the potential to influence the government's payment decision and were material to the government's decision to pay the claims. Triple Canopy caused the United States to make payments for security guard services that it would not have made had it known that Triple Canopy was not properly training and equipping guards in accordance with the contract. The United States only pays for goods and services that are provided in conformity with contractual requirements.

108. The United States paid the false or fraudulent claims.

109. Defendants' false records and statements were foreseeable factors in the United States' loss and a consequence of the scheme. By virtue of Defendants' actions, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## PRAYER FOR RELIEF

110. WHEREFORE, Relator respectfully requests that the Court enter judgment against the Defendants and award the following:

(1) Damages in the amount of three (3) times the actual damages suffered by the United States as a result of Defendants' conduct;

(2) Civil penalties against Defendants up to the maximum allowed by law for each violation of 31 U.S.C. § 3729;

(3) The maximum award Relator may recover pursuant to 31 U.S.C. § 3730(d);

(4) All costs and expenses of this litigation, including attorneys' fees and costs of court; and

(5) All other relief on behalf of Relator or the United States that the Court deems just and proper.

**C.      Count III – Retaliation (31 U.S.C. § 3730(h))**

111.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

112.    In violation of 31 U.S.C. § 3730(h), Defendant retaliated against Relator as a result of lawful acts he conducted in furtherance of efforts to stop Defendants from committing violations of the False Claims Act. Specifically, Triple Canopy retaliated against Relator as a result of his reports related to security breaches and Triple Canopy's failure to perform work in accordance with its contract with the United States.

113.    Mr. Kentta has suffered economic loss as a result of Defendants' retaliatory acts and is entitled to relief pursuant to 31 U.S.C. § 3730(h).

## PRAYER FOR RELIEF

114.    Relator prays that the Court enter judgment against Defendants for the following:

    (1)   Two times the amount of Relator's back pay;

    (2)   Interest on Relator's back pay;

    (3)   Compensation for special damages sustained by Relator as a result of Defendants' actions;

    (4)   Litigation costs and attorney fees; and

    (5)   Any other relief the Court deems just and proper to make the Relator whole.

## XII.    DEMAND FOR JURY TRIAL

115.    Pursuant to Federal Rule of Civil Procedure 38, Relator demands a trial by jury.

## XIII.    DOCUMENTARY EVIDENCE

116.    The documentary evidence referenced herein consists of the following:

| Exhibit No. | Description | Bates No. |
|:---:|:---|:---:|
| 1 | August 10, 2016 Performance Work Statement for contract no. W52P1J11D0045 | REL000001 – 37 |
| 2 | Summaries of Task Order OK05 and modifications | REL000038 – 44 |
| 3 | Summaries of Task Order OK06 and modifications | REL000045 – 66 |
| 4 | Summaries of Task Order OK07 and modifications | REL000067 – 80 |
| 5 | Summaries of Task Order OK08 and modifications | REL000081 – 100 |
| 6 | Summaries of Task Order OK09 and modifications | REL000101 – 117 |
| 7 | Summaries of Task Order OK10 and modifications | REL000118 – 134 |
| 8 | Summaries of Task Order OK11 and modifications | REL000135 – 148 |
| 9 | Summaries of Task Order OK12 and modifications | REL000149 – 155 |
| 10 | Video showing Relator attempting to operate a weapon that would not fire | N/A |
| 11 | Camp Scorpion shift schedule | REL000156 |
| 12 | Triple Canopy's description of Guardian Angel detail | REL000157 |
| 13 | Triple Canopy's Performance Work Statement Policy | REL000158 |

33

Respectfully submitted,

**BERG & ANDROPHY**

_____

Joel M. Androphy
D.C. Bar No. 999769
TX State Bar No. 01254700
Janis G. Gorton (*Pro Hac Vice* admission pending)
TX State Bar No. 24071063
3704 Travis Street
Houston, Texas 77002
Telephone (713) 529-5622
Facsimile (713) 529-3785

34

## CERTIFICATE OF SERVICE

I hereby certify that on January 9, 2019 a true and correct copy of this Original Complaint was mailed to the United States Department of Justice and the United States Attorney's Office in the District of Columbia via certified mail, return receipt requested.

_____
Joel M. Androphy